IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Dr. Lawrence Cooper, DDS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 19 C 6855 |
| | ) |
| Dr. Howard I. Cooper; and | ) |
| Excellence in Dentistry, Ltd., | ) |
| | ) |
| Defendants. | ) |

Memorandum Opinion & Order

Dr. Lawrence Cooper, DDS ("Larry"),[1] sued his son Dr. Howard I. Cooper ("Howard") and Howard's corporation Excellence in Dentistry, Ltd. ("EID") in October 2019. In his first amended complaint, Dkt. No. 30, Larry asserts claims against Howard for breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing, as well as an unjust enrichment claim against both defendants. Larry now moves for partial summary judgment. In his view, the only remaining issue for a jury to decide is punitive damages under the fraud claim. For the following reasons, the motion is granted in part and denied in part.

---

[1] Plaintiff refers to himself as "Larry" in his brief, so I adopt that shortened name here.

I.

The following facts are undisputed except where noted. Larry and Howard are father and son, and both are dentists. Pl.'s Statement of Material Facts ("PSOF"), Dkt. No. 56 ¶ 1. Prior to 2010, Howard worked at Larry's practice, which Larry owned through the corporation 2-Gentle Dental Associates, Ltd. ("2-Gentle"). *Id.* ¶ 2. When Larry decided to retire, he and Howard entered into an Asset Purchase Agreement dated November 1, 2010. *Id.* ¶¶ 3-4; Pl.'s Ex. 2, Dkt. No. 56-2 (the "Asset Purchase Agreement"). Under the agreement, Howard paid $180,000 in exchange for the "entire interest in the business assets" of the "dental practice located at 5101 Washington Street, Gurnee, Illinois." Asset Purchase Agreement at 3 (first and second WHEREAS recitals), § I.A; *see id.* (NOW THEREFORE clause) ("Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the'the practice'} [sic] on the following terms and conditions."); PSOF ¶¶ 5-6.

> Section XX of the Asset Purchase Agreement states:
>
> Subsequent Sale of Dental Practice. In the event that the Purchaser sells or merges the dental practice or sells the assets separately where the assets sold are not replaced with an asset of equal value prior to January 2, 2024, Dr. Lawrence Cooper shall be entitled to receive fifty (50%) percent of the net sales price.

The agreement also contains an integration (or "entire agreement") clause and a clause requiring any amendments to the agreement to be signed and in writing. Asset Purchase Agreement §§ XXII, XXIII.

The transaction closed on January 1, 2011. Defs.' Statement of Material Facts ("DSOF"), Dkt. No. 74 ¶ 13. That same day, Howard transferred the assets from the sale to EID, a corporation he had formed and of which he was the sole shareholder and sole director. PSOF ¶¶ 18-19; DSOF ¶ 23.

In April 2019, Howard, EID, and Zieba Dentistry Gurnee, Ltd. ("Zieba") entered into a separate asset purchase agreement. PSOF ¶ 24; Pl.'s Ex. 7, Dkt. No. 56-7 (the "Zieba Agreement"). Under the Zieba Agreement, in exchange for about $2.4 million, Zieba acquired "substantially all of the assets of [EID] relating to or used in the Practice," where "Practice" was defined as the "dental practice . . . located at 5101 Washington Street, Gurnee IL 60031." PSOF ¶¶ 25, 29. Certain assets were excluded under the Zieba Agreement, such as cash, causes of action, accounts receivable, and rights under the Zieba Agreement belonging to EID as of the closing date of that agreement, as well as Howard's personal effects located at the office, including artwork and other decorations. *Id.* ¶ 26. Larry did not receive any share of the money from the transaction with Zieba. *Id.* ¶ 33.

At his deposition, Howard testified that he had an oral agreement with Larry that Section XX of the Asset Purchase Agreement would only apply for two or three years. *Id.* ¶¶ 12-13. Howard asked Larry to make this shorter term explicit in Section XX of the Asset Purchase Agreement, but Larry refused. *Id.* ¶ 15.

3

II.

Summary judgement is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I resolve all factual disputes in defendants' favor and give them "the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012) (citation omitted).

A.

Larry asserts that Howard breached Section XX of the Asset Purchase Agreement when he failed to pay Larry half of the net sale price from the Zieba transaction. To succeed on this claim, Larry must establish: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Zirp-Burnham, LLC v. E. Terrell Assocs., Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005) (citation and quotation marks omitted).

There is no dispute that the first two elements are met.[2] *See* PSOF ¶¶ 4, 6; DSOF ¶¶ 12–13, 17, 20. Additionally, Howard does not

---

[2] To the extent that defendants argue that Section XX is unenforceable because it is contrary to public policy, that

4

contest Larry's assertion that the damages are one half of the net sale price under the Zieba Agreement, which Larry supports with record evidence. Howard acknowledged at his deposition that "the net sales price of every asset that [he] sold to Zieba" was $2,408,714.19, Howard Dep., Pl.'s Ex. 1, Dkt. No. 56-1 at 96:17–20, a figure which is also reflected in the transaction's closing statement. PSOF ¶ 29. Half of that amount is $1,204,357.09, which I accept as the damages to which Larry is entitled if successful on his breach of contract claim. *See NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (finding where defendant did not contest damages at summary judgment, it waived the issue).

That leaves only a dispute over the element of breach. Defendants suggest that the term "practice" is ambiguous as used in the Asset Purchase Agreement. But the agreement clearly provides for the sale of the "practice" to Howard. For example, $180,000 was the "total consideration and purchase price for the sale of the practice," Asset Purchase Agreement § I.A; *see also id.* § II (describing schedule for "[p]ayment of the purchase price for said practice"). It is true that one of the recitals refers to Larry's desire to sell the "entire interest in the business assets of said practice" to Howard, *id.* at 3, which defendants argue shows that

---

argument is conditioned on a particular reading of Section XX and I consider it a dispute over whether there was a breach, rather than whether there was a valid contract.

5

the sale is for some assets of the practice rather than the practice itself. But sale of the assets of the practice is not inconsistent with sale of the practice. Any doubt as to the scope of the agreement is resolved by the above-cited portions of the agreement and the "NOW THEREFORE" clause, which summarizes the transaction as one in which "Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the'the practice'} [sic] on the following terms and conditions." *Id.* The agreement then goes on to specify what assets Howard will receive as part of his purchase of the practice: tangible assets ranging from fixtures and equipment to patient records and accounts receivable, *id.* §§ I.A.1, V, VII, as well as intangible assets like goodwill, *id.* §§ I.A.2, V.

Section XX--the focus of the parties' dispute--is itself premised on the fact that what Larry sold Howard in 2011 was the practice. It contemplates what should happen if, among other things, Howard "sells or merges the dental practice." *Id.* § XX. If Howard were never given the practice in the first place, that provision would be rendered meaningless. *See Prestwick Cap. Mgmt. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 656 (7th Cir. 2013) ("Illinois requires that meaning and effect be given to every part of a contract including all its terms and provisions, so no part is rendered meaningless unless absolutely necessary." (internal punctuation and citation omitted)). To top it off, Howard admitted

6

to the fact that he "acquired the Dental Practice from Larry when Larry retired," PSOF ¶ 3 (citing Howard Dep. at 10:14-16), where "Dental Practice" was defined as the practice at which both Larry and Howard practiced as of 2010, *id.* ¶ 2. *See also* Defs.' Resp. to PSOF, Dkt. No. 75 ¶¶ 2, 3 (admitting these facts).

In support of his argument that the term "practice" is ambiguous, Howard emphasizes that asset sales and stock sales are treated differently for purposes of successor liability, as well as the fact that "Lawrence retained ownership of all of the shares in his entity, 2-Gentle, and did not transfer any stock or shares to Howard," Resp., Dkt. No. 71 at 6 (citing DSOF ¶¶ 11, 22). These propositions may be true, but defendants do not explain why sale of the "practice" could only be effectuated through a stock sale, rather than an asset sale including patient records, accounts receivable, and goodwill. As discussed above, the agreement itself establishes that it is for sale of the practice.

I thus reject defendants' position that the term "practice" as used in the Asset Purchase Agreement is ambiguous. *See Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000) ("Ambiguity can be found only if the contract language is 'reasonably or fairly susceptible of more than one construction.'" (quoting *A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.*, 477 N.E.2d 30, 33 (Ill. App. Ct. 1985))). Pursuant to Section XX's terms, there are two scenarios under which

7

Larry "shall be entitled to receive fifty (50%) percent of the net sales price." First, if, prior to January 2, 2024, Howard "sells or merges the dental practice," and second, if, prior to January 2, 2024, Howard "sells the assets separately where the assets sold are not replaced with an asset of equal value." Asset Purchase Agreement § XX.[3]

Howard next argues that Section XX is inapplicable to his transaction with Zieba because the assets that Howard sold were not the same as those he received from Larry in 2011.[4] According to Howard, between 2011 and 2019, he got rid of most of the assets he had received from Larry and "replaced them as needed." DSOF

---

[3] Defendants previously argued in a partial motion to dismiss that Section XX gives Howard until January 2, 2024, to replace any assets he sold. *See* Dkt. No. 35. They do not raise this argument now, however, so I need not explain why I find that interpretation unreasonable. But even were I to find the text of Section XX ambiguous on this point, defendants have offered no evidence that would support an interpretation giving them until January 2024 to replace sold assets. Larry, on the other hand, offers evidence indicating that both parties understood that Section XX was intended to prevent Howard from "flipping" the practice. *See, e.g.*, Howard Dep. at 42:22-23 (A. "I mean, what we meant that was put in there so that the practice wouldn't be flipped."); *id.* at 45:16-21 ("Q. So I want to ask you some questions about this language where the assets sold are not replaced with an asset of equal value or sells or merges the dental practice, that stuff. You referred to this being about flipping the practice, right? A. That's what he told me, yes."). Adopting an interpretation of Section XX that gave Howard until January 2024 to replace sold assets would be entirely inconsistent with that intent.

[4] Consistent with Larry's stipulation, which he makes only for purposes of this motion, I will assume that Howard sold Zieba assets of the practice, rather than the entire practice. *See* Mot., Dkt. No. 55 at 11 n.3.

¶ 30. Howard also points out that the Asset Purchase Agreement does not contain an "after acquired assets" clause and asserts that the agreement only applied to the actual assets sold to him in 2011. There may not be an "after acquired assets" clause, but neither is there a clause omitting assets acquired after 2010 from Section XX's reach. Indeed, the only reasonable reading of Section XX confirms that it was meant to apply to replacement assets because if it were not, then Howard could have sold the assets in 2011, replaced them with assets of equal value, and then sold those replacement assets and kept the proceeds for himself.

Howard may have replaced many of the practice's assets, but the evidence one-sidedly supports the notion that the assets sold to Zieba in 2019 were part of the practice that Howard bought from Larry, bringing them under the purview of Section XX. For example, under the Asset Purchase Agreement, Howard bought "a dental practice located at 5101 Washington Street, Gurnee Illinois," and in 2019 he sold "substantially all the assets" of "a dental practice . . . located at 5101 Washington Street, Gurnee, IL 60031." *See* Asset Purchase Agreement at 3 (first WHEREAS clause); Zieba Agreement at 4 (second and third WHEREAS clauses). Additionally, at his deposition, Howard testified that in 2019 he "sold assets of the practice" while discussing the practice he had bought from Larry and the applicability of Section XX. Howard Dep. at 58:11-59:6. And finally, Howard, through his counsel,

9

previously admitted that the 2019 sale came within the ambit of Section XX's reference to a sale of assets, by arguing earlier in this litigation that although the 2019 sale to Zieba was a sale of assets within the meaning of Section XX, he could not be liable for that sale until 2024. Dkt. No. 35 at 2 (stating unequivocally that "the asset purchase for the 2019 sale is not one in which the seller 'sells or merges the dental practice,' but instead one whereby the seller 'sells the assets separately' (quoting Section XX)); *id.* at 8–9. This may be treated as a judicial admission. *See Pierce v. City of Chicago*, No. 09-CV-1462, 2012 WL 401026, at *3–4 (N.D. Ill. Feb. 7, 2012) (collecting cases and holding that statements made in any brief, even if not part of pending motion, can constitute binding judicial admission).

Howard's remaining argument on the issue of whether Section XX applied to the 2019 sale is meritless. He asserts that the fact that he was to pay Larry the $180,000 purchase price over the course of two years, and that Howard was to pay Larry's life insurance premiums for three years, meant that Section XX was only supposed to apply for two or three years. In the face of the unambiguous text of Section XX stating that it applies until January 2, 2024, however, that argument carries no weight.

Howard also argues that Section XX is unenforceable because it is contrary to public policy, citing an Illinois Supreme Court case discussing the factors that determine whether a restrictive

10

covenant is "reasonable." *See Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396–97 (Ill. 2011). I agree with Larry that Section XX does not constitute a restrictive covenant of the type described in that case. Section XX leaves Howard free to practice dentistry and to compete with the practice by opening another one; it simply requires him to split the proceeds from sale of the practice or its assets.

Finally, in responding to Larry's fraud claim, Howard briefly gestures to an argument he made previously in this litigation-- that "he is immune from liability because the 2019 Zieba transaction was with EID, not with himself," which "clearly . . . precludes summary judgment." Resp. at 14. He does not flesh out this argument and it is unpersuasive, so it is waived. *See Boudreau v. Gentile*, 646 F. Supp. 2d 1016, 1023 (N.D. Ill. 2009) (citing *Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005)).

B.

Howard also argues that there are material questions of fact regarding his fraudulent inducement defense, which he raises on two grounds. First, he argues that "he was led to believe that his father's dental practice in Gurnee was profitable with over $1 million in business income, when in fact, it was not" and that Larry "did not disclose to Howard that the business was operating at a substantial loss of $200,000, or that at the time of closing, it had debts of over $50,000 and an operating business loss of

11

$36,000." Resp. at 12 (citing DSOF ¶¶ 7, 9, 11-14). But the cited portions of defendants' statement of facts do not identify any false statement by Larry, which is an essential element of the defense. *See Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1341 (7th Cir. 1992) (citing *Cotter v. Parrish*, 520 N.E.2d 1172, 1175 (Ill. App. Ct. 1988)). Assuming that Howard meant to cite to his affidavit, Dkt. No. 74-1, rather than his statement of facts, that too fails to identify a false statement. In the affidavit, Howard asserts that Larry "did not share the 2008 tax return" (which showed a profitable year) with Howard until November 17, 2010, *id.* ¶¶ 7-9; that only after closing the transaction did Howard receive the 2009 tax return showing a loss, *id.* ¶¶ 11-13; and that Howard "was not aware at the time of closing" that the practice was operating at a loss or had certain debts, *id.* ¶ 14. A jury could not find on these facts that Larry made a false or misleading statement about the financial condition of the practice.

Next, Howard asserts that Larry misrepresented that "Section XX was only intended to prevent 'flipping' of the practice assets for 2-3 years." Resp. at 12. In other words, that Larry promised that he would not enforce Section XX as written. Illinois generally does not recognize promissory fraud claims--that is, claims premised on statements of future intent. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill.

12

1989). But there is an exception where the fraudulent statements are part of a "scheme to defraud." *Id.* Such a scheme "requires a pattern of fraudulent statements, or one particularly egregious fraudulent statement." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011) (citations omitted).

Here, Howard only puts forth a single allegedly fraudulent statement, and it is not clear that it is "particularly egregious." In any event, Howard falls short on another essential element of a fraudulent inducement defense: reliance. *See Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (citation omitted) (Illinois law). "Although reliance is normally a question of fact, it can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (citing *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 692 N.E.2d 812, 819 (Ill. App. Ct. 1998)). In light of (1) the language in the Asset Purchase Agreement stating that Section XX remained in force through January 2, 2024, (2) Howard's admission that he sought to have this provision changed to reflect a two- to three-year period only to have Larry decline, and (3) the integration clause and the clause stating that any amendments to

the agreement had to be in writing, no jury could find that Howard's reliance on Larry's alleged promise was reasonable.

C.

Larry argues that he is entitled to summary judgment on his fraud claim, aside from the determination of punitive damages. In Illinois, the elements of fraud are: "(1) false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance on the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 7 (Ill. App. Ct. 2001) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996)). "[S]ummary judgment ought to be used sparingly and with great caution in cases such as this one where subjective intent is a factor in the determination," although it may be appropriate if "the undisputed facts make the outcome clear." *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993).

As noted above, Illinois generally does not recognize promissory fraud claims like Larry's, except where the fraudulent statements are part of a "scheme to defraud." *HPI Health Care Servs.*, 545 N.E.2d at 682. Larry points to two sets of facts that he argues prove fraud. First, Howard signed the agreement intending to ignore Section XX, knowing that Larry would only agree to the deal with that provision included. PSOF ¶¶ 12–13, 15–17. Second,

14

Howard created EID, assigned the practice assets to that entity, and used EID to sell the assets to Zieba, arguing earlier in this litigation that this maneuvering insulated him from liability under Section XX. *Id.* ¶¶ 18, 20-21, 25-26, 33-34.

Howard has put forth evidence to at least create a triable issue as to the second set of facts, such as evidence suggesting that Larry was aware that Howard had created EID soon after the transaction had closed. DSOF ¶ 25-26. A jury could find that if Howard were trying to defraud his father through the creation of EID, he would have done a better job hiding this allegedly deceitful act. Additionally, Howard observes that Larry himself had owned his practice through a corporation of which he owned all the shares, 2-Gentle. *Id.* ¶ 3-4. A jury could find that Howard was simply doing the same by creating EID, using it to operate the practice, and ultimately selling the practice through EID. Finally, Howard's lawyers' earlier attempts to argue that EID, not Howard, would bear liability under Section XX do not strike me as evidence that this was Howard's plan all along. Those attempts could be viewed as arguments formed after-the-fact to escape liability.

That leaves the first set of facts. But under those facts, the only allegedly fraudulent statement by Howard was his promise in the Asset Purchase Agreement to split the proceeds of a sale before 2024. *See* Larry Aff., Pl.'s Ex. 11, Dkt. No. 56-11 ¶ 3.

15

That does not constitute a "pattern of fraudulent statements" or "one particularly egregious fraudulent statement." *BPI Energy Holdings*, 664 F.3d at 136 (citations omitted).

D.

I deny Larry's motion as to his claims for breach of the implied covenant of good faith and fair dealing and for unjust enrichment. Although Larry is right that in Illinois a covenant of good faith and fair dealing is implied into every contract, alleged violation of that covenant cannot form an independent cause of action. *See Barwin v. Village of Oak Park*, 54 F.4th 443, 454 (7th Cir. 2022) (citations omitted). Instead, breach of the implied covenant is a theory on which to bring a breach of contract claim. *See LaSalle Bank Nat'l Assoc. v. Paramont Props.*, 588 F. Supp. 2d 840, 853 (N.D. Ill. 2008); *see also Barwin*, 54 F.4th at 454 (noting that the covenant "functions as an interpretive aid"). Having already resolved Larry's breach of contract claim in his favor, I find no role for this interpretive aid.

An unjust enrichment claim, on the other hand, can serve as an independent cause of action and can be pled in the alternative to a breach of contract claim, but "Illinois law holds that a plaintiff cannot recover under both breach-of-contract and unjust enrichment theories." *Bruger v. Olero, Inc.*, 434 F. Supp. 3d 647, 658 (N.D. Ill. 2020) (citing *Prima Tek II, L.L.C. v. Klerk's Plastic Indus. B.V.*, 525 F.3d 533, 541 (7th Cir. 2008); *Enger v.*

16

*Chi. Carriage Cab Corp.*, 812 F.3d 565, 570 (7th Cir. 2016)). Because I have found for Larry on his breach of contract claim, the motion as to this claim is denied.

### III.

For the foregoing reasons, plaintiff's motion for partial summary judgment is granted in part and denied in part. It is granted as to the breach of contract claim, and denied as to the remaining claims for fraud, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: February 17, 2023

17